**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **FRIENDS OF THE RIVER,** | |
| **Plaintiff,** | |
| **v.** | **No. 16-cv-2327-ZMF** |
| **UNITED STATES ARMY CORPS OF ENGINEERS**, *et al.*, | |
| **Defendants.** | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff, Friends of the River ("FOR"), has requested attorneys' fees for its successful litigation in a nine-year-long Freedom of Information Act ("FOIA") dispute with Defendant United States Army Corps of Engineers ("Corps"). *See* Mem. Supp. Pl.'s Mot. Award Att'ys' Fees & Costs ("Pl.'s Mot.") 1–2, ECF No. 106-1; 5 U.S.C. § 552(a)(4)(E)(i). The Court concludes that FOR is eligible for a fee award, but that its request is unreasonable. Therefore, the Court GRANTS FOR's motion for attorneys' fees in part and DENIES in part and awards FOR attorneys' fees of $491,676.60 and costs of $2,548.74.

I.     **BACKGROUND**

In the spring of 2016, FOR sent a series of FOIA requests to the Corps. *See* Am. Compl. Exist. Legal Claims Freedom Info. Act Case ("Am. Compl.") ¶ 15, ECF No. 73. The relevant FOIA requests related to the Corps' operation and management of dams on the Yuba River and their effect on several fish species protected by the Endangered Species Act. *See id.* ¶¶ 1–2.

On September 1, 2016, FOR filed a complaint in the Northern District of California. *See* Compl. ¶ 1., ECF No. 1. The complaint alleged that the Corps inadequately searched its records

1

and improperly withheld responsive documents. *See id.* On November 22, 2016, the court declined to dismiss the case but granted the Corps' motion to transfer venue to the District of Columbia. *See generally* Order Granting in Part Mot. Def. U.S. Army Corps of Eng'rs & Transferring Improper Venue ("Venue Op."), ECF No. 21. From 2017 to 2021, the parties filed three more rounds of dispositive motions. *See generally* ECF Nos. 35–96. These motions ultimately narrowed the thrust of the case to whether the Corps properly withheld documents in its possession under relevant FOIA privileges. *See* Am. Compl. ¶¶ 32–41.

On June 21, 2023, Judge Cobb determined that the Corps improperly withheld some records under the deliberative process privilege. *See* Mem. Op. 1–2, ECF No. 96. However, Judge Cobb found that the Corps properly withheld records under the attorney-client and work-product privileges. *See id.* at 2.

In November 2023, FOR moved for a fee award. *See generally* Pl.'s Mot. FOR seeks $747,819.63 in attorneys' fees and an additional $2,548.74 in litigation costs. *See* Reply Supp. Pl.'s Mot. Att'ys' Fees & Costs ("Reply") 25, ECF No. 117. The Corps disputes the reasonableness of this request. The Corps asks that FOR receives no attorneys' fees or that it receives no more than $256,565.67. *See* Def.'s Opp'n Pl.'s Mot. Att'y's Fees ("Opp'n") 19, ECF No. 116.

On November 7, 2024, Judge Cobb referred the case to the undersigned. *See* Min. Order (Nov. 7, 2024). On November 21, 2024, the parties consented to proceed for all purposes before the undersigned. *See* ECF No. 122.

## II.    LEGAL STANDARD

### A.    Fee Eligibility and Entitlement

FOIA provides, in pertinent part, that a "court may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this

section in which the complainant has substantially prevailed." 5 U.S.C. § 552(a)(4)(E)(i). Courts follow a two-step analysis to determine attorney's fee awards. *See McKinley v. Fed. Hous. Fin. Agency*, 739 F.3d 707, 710 (D.C. Cir. 2014). First, the court evaluates whether the applicant is *eligible* for attorney's fees by analyzing whether it "substantially prevailed" in the original action. 5 U.S.C. § 552(a)(4)(E)(i). "[A] complainant has substantially prevailed if the complainant has obtained relief through . . . a judicial order." *Id.* § 552(a)(4)(E)(ii). Second, the court evaluates whether the applicant is *entitled* to attorney's fees via a four-factor analysis: "(1) the public benefit derived from the case, (2) the commercial benefit to the requester, (3) the nature of the requester's interest in the information, and (4) the reasonableness of the agency's conduct." *Morley v. CIA*, 719 F.3d 689, 690 (D.C. Cir. 2013).

"[T]he district court is 'better suited [than the appellate court] to make the initial determination' about whether a litigant is entitled to attorney's fees, given that the district court closely monitored the litigation." *Morley v. CIA*, 894 F.3d 389, 391 (D.C. Cir. 2018) (quoting *Davy v. CIA*, 456 F.3d 162, 167 (D.C. Cir. 2006)). Therefore, appellate courts "[d]eferentially" review both a district court's individual outcome for each eligibility factor and the ultimate outcome of the four-factor analysis. *Id.*

B. Attorney's Fee Calculation

"The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate."[1] *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). The party moving for fees bears the burden of proving the reasonableness of both the hours requested and the appropriate hourly rate. *See Role*

---

[1] This value is known as the "lodestar."

*Models Am., Inc. v. Brownlee*, 353 F.3d 962, 970–71 (D.C. Cir. 2004). Further, "[t]here remain other considerations that may lead the district court to adjust the fee upward or downward, including the important factor of the 'results obtained.' This factor is particularly crucial where a plaintiff is deemed 'prevailing' even though he succeeded on only some of his claims for relief." *Hensley*, 461 U.S. at 434.

## III.    ANALYSIS

### A.    Attorney's Fee Assessment

The Corps does not contest that FOR substantially prevailed. *See* Opp'n at 2–3.

The question then is what fees FOR is entitled to. The answer lies in the four-factor analysis. The Corps does not dispute that the second and third factors "weigh in Plaintiff's favor." *Id.* at 4.[2] The contested factors are "the public benefit derived from the case" and "the reasonableness of the agency's conduct." *Morley*, 719 F.3d at 690.

---

[2] These middle two factors "are often considered together" because they both ultimately "assess whether a plaintiff has 'sufficient private incentive to seek disclosure' without attorney's fees." *Davy v. CIA*, 550 F.3d 1155, 1160 (D.C. Cir. 2008) (quoting *Tax Analysts v. U.S. Dep't of Just.*, 965 F.2d 1092, 1095 (D.C. Cir. 1992), *superseded by statute on other grounds*, OPEN Government Act of 2007, Pub. L. No. 110–175, 121 Stat. 2524). The Corps disputes what weight the Court should afford these two factors. *See* Opp'n at 3–4. It contends that *Assassination Archives & Rsch. Ctr., Inc. v. CIA* limits these two factors to "only marginally" supporting FOR's request. No. 17-cv-160, 2019 WL 1491982, at *4 (D.D.C. Apr. 4, 2019). But *Assassination Archives* is inapplicable. There was only marginal support for the plaintiff there because a "private incentive" *was* present to count against that plaintiff's fee request. *Id.* Here, the Corps identified no parallel private incentive or benefit. To the contrary, it seems that FOR has little or no private incentive in disclosure status as a not-for-profit, tax-exempt, educational organization. *See Elec. Priv. Info. Ctr. v. Dep't of Homeland Sec.*, 811 F. Supp. 2d 216, 235 (D.D.C. 2011). The second and third factors strongly favor FOR's request.

4

1.    *"Public Benefit" Factor*

This factor "requires consideration of both the effect of the litigation for which fees are requested and the potential public value of the information sought." *Davy*, 550 F.3d at 1159.

"'[T]he effect of the litigation' inquiry is properly understood as asking simply whether the litigation has caused the release of requested documents." *Morley v. CIA*, 810 F.3d 841, 844 (D.C. Cir. 2016). This inquiry must support FOR because its litigation resulted in the release of many hundreds of government documents. *See, e.g.*, *Ctr. for Popular Democracy v. Bd. of Governors of the Fed. Reserve Sys.*, No. 16-cv-5829, 2021 WL 4452202, at *7 (E.D.N.Y. Sep. 29, 2021) ("'[T]he effect of the litigation' component of the first factor favors [plaintiff's] fee entitlement, as [plaintiff's] lawsuit resulted in the release of 435 pages of responsive documents.").

"[P]otential public value" "requires an *ex ante* assessment of the potential public value of the information requested, with little or no regard to whether any documents supplied prove to advance the public interest. . . . [I]f it's plausible *ex ante* that a request has a decent chance of yielding a public benefit, the public-benefit analysis ends there."[3] *Morley*, 810 F.3d at 844. Generally, "public value" means "useful new information about a matter of public concern." *Id.* (internal citation and quotation omitted).

In the context of FOIA, "[a] significant public interest lies in shedding light on the workings of [an agency]." *Wash. Post Co. v. U.S. Dep't of Agric.*, 943 F. Supp. 31, 36 (D.D.C. 1996). *Washington Post* sets a guidepost for this analysis. There, a plaintiff filed a FOIA suit to gather research for an article about cotton subsidy recipients. *Id.* at 33. Judge Friedman found that a public

---

[3] The Corps attempts to define potential public value as the *actual* benefits of the litigation. *See* Opp'n at 5 (stating that FOR provided "no indication that the information has augmented public information broadly available to citizens[,]" nor whether the organizations to which it provided the documents "even reviewed them"). This is incorrect. The examination is *ex ante*, not *ex post*. *See Morley*, 810 F.3d at 844.

interest existed where "the release of the recipients' names, addresses and subsidy amounts could illuminate . . . allegations of fraud and conflict of interest . . . sufficient to raise nonspeculative questions about the workings of the USDA." *Id.* at 36.

Here, FOR sought records that would shed light on whether the Corps was complying with Endangered Species Act duties to ensure the dams the Corps managed were not jeopardizing threatened fish species. *See* Pl.'s Mot. at 8. FOR's request—like the Washington Post's request—tested whether the government was complying with applicable law. *See Wash. Post Co.*, 943 F. Supp. at 36. Additionally, FOR sought information "sufficient to raise nonspeculative questions about the workings of the [Corps]." *Id.* at 36; *see* Am. Compl. ¶ 14. For example, in one request FOR asked for the Corps' assessments of "fishery habitat restoration and enhancement actions on the Yuba River" to determine whether the Corps was taking steps towards compliance with ESA and regional requirements. Compl. ¶ 26. "Under the FOIA's presumption in favor of disclosure and its core purpose of informing the public about the workings of government, no more is required" than this. *Wash. Post Co.*, 943 F. Supp. at 36.

"The [potential public value] inquiry is furthered by considering the likely degree of dissemination and the public impact that can be expected from a particular disclosure." *Horsehead Indus., Inc. v. EPA,* 999 F. Supp. 59, 68 (D.D.C. 1998). The likely degree of dissemination here is high. An attorney for FOR noted that, "[f]or many years and on numerous occasions dating back to 2006, I have provided briefing to staff of many [environmental] organizations concerning . . . FOR's . . . [previous] litigation against the Corps." Reply Decl. Christopher Sproul Supp. Pl.'s Mot. Att'ys' Fees & Costs ("Sproul Decl.") ¶ 14, ECF No. 117-5. That historical trend continued here. "FOR disseminated information it learned from the records to other interested environmental organizations seeking to compel the Corps to comply with its [Endangered Species Act]

obligations." Pl.'s Mot. at 8. According to FOR, "[t]he issue of the Corps' adverse impacts on salmon, steelhead, and sturgeon populations in the Yuba River and what might be done to protect these fish species . . . has generated substantial general public interest" among environmental groups. Sproul Decl. ¶ 15. The Court has no reason to doubt this. Indeed, a national newspaper discussed the litigation in at least two articles. *See id.* Because "the likelihood that the data will be disseminated [is not] speculative[,]" and the data were of value to many outside FOR, FOR's request generated a public benefit. *Horsehead Indus.*, 999 F. Supp. at 69.

Overall, this factor points strongly in favor of FOR. "[Its] victory is likely to add to the fund of information that citizens may use in making vital political choices." *Cotton v. Heyman*, 63 F.3d 1115, 1120 (D.C. Cir. 1995).

### 2. *"Reasonableness" Factor*

"The fourth factor considers whether the agency's opposition to disclosure had a reasonable basis in law and whether the agency had not been recalcitrant in its opposition to a valid claim or otherwise engaged in obdurate behavior. If the Government's position is correct as a matter of law, that will be dispositive [to show reasonableness]. If the Government's position is founded on a colorable basis in law, that will be weighed along with other relevant considerations in the entitlement calculus."[4] *Davy*, 550 F.3d at 1162 (internal citations and quotations omitted). The burden is on the government to show reasonableness. *See id.* at 1162–63.

### a. Failure to demonstrate foreseeable harm

The Corps does not argue its position was correct as a matter of law. Instead, it argues that the requirements of a 2016 FOIA amendment remained sufficiently unclear throughout the

---

[4] Courts rarely interpret what a "colorable basis in law" means. *See, e.g.*, *Davy*, 550 F.3d at 1163 (invoking the term but not defining it). Black's Law Dictionary describes it as "(Of a claim or action) appearing to be true, valid, or right." *Colorable*, Black's Law Dictionary (12th ed. 2024).

litigation that the Corps' failure to comply with its withholding provision was nevertheless reasonable. *See* Opp'n at 6. The Corps maintains that this lack of clarity endured at least until "the Corps' most recent motion for summary judgement was filed in April 2020," which marked the beginning of the final round of the merits litigation. *Id.* at 6.

The Corps' failed opposition to disclosure was rooted in FOIA's Exemption 5. Exemption 5 permits agency withholding of "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). Relevant within Exemption 5 is the deliberative process privilege.[5] For the privilege to apply, the agency must articulate the foreseeable harm that would result from the disclosure of the documents. *See id.* § 552(a)(8)(A); Mem. Op. at 11. This includes providing "a focused and concrete demonstration of why disclosure of the particular type of material at issue will, in the specific context of the agency action at issue, actually impede those same agency deliberations going forward." *Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 370 (D.C. Cir. 2021). On June 30, 2016, Congress codified the foreseeable harm requirement as part of the FOIA Improvement Act of 2016, Pub. L. No. 114–185, 130 Stat. 538.

FOR filed their FOIA requests shortly before Congress enacted the FOIA Improvement Act of 2016. However, the Corps "agreed to comply with" the FOIA Improvement Act of 2016. Opp'n at 6. On October 2, 2019, the parties laid out this agreement in their joint production schedule. *See* Proposed Joint Sched. Doc. Produc. & Further Procs. 1, 3, ECF No. 67. Judge Cobb then codified the joint production schedule via an order. *See* Sched. Order E Doc. Produc. &

---

[5] This privilege protects "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Loving v. Dep't of Def.*, 550 F.3d 32, 38 (D.C. Cir. 2008) (quoting *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001)).

Further Procs. 1, 3, ECF No. 69. The scheduling order obligated the Corps to follow the FOIA Improvement Act of 2016's foreseeable harm requirement: a "scheduling order is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril[,]" but instead acts with the force of law: violations permit imposition of "appropriate sanction[s] for conduct which abuses the judicial process." *Act Now to Stop War and End Racism Coal. v. District of Columbia*, 286 F.R.D. 117, 120 (D.D.C. 2012) (internal quotations and citations omitted). Post-scheduling order, the Corps provided revised explanations of its FOIA withholdings purporting to address the foreseeable harm standard for each relevant entry. *See* Defs.' Mem. Law Supp. Mot. Summ. J. 5, ECF No. 79-1; Sched. Order E Doc. Produc. & Further Procs. at 1, 3.

Yet the Corps did not actually comply with the Act when they submitted their renewed *Vaughn* indices.[6] "The majority of the entries in the Corps' [*Vaughn*] indices that deal[t] with the deliberative process privilege ma[d]e *no* mention of foreseeable harm." Mem. Op. at 12 (emphasis added). And "the entries that d[id] purport to describe a foreseeable harm mostly d[id] so only in broad, non-specific language." *Id.* The Corps cannot cling to a lack of clarity around the foreseeable harm requirement when, in many instances, it never mentioned the requirement at all. *Cf. Elec. Priv. Info. Ctr. v. IRS*, 18-cv-902, 2023 WL 4892712, at *46–47 (D.D.C. June 2, 2023) (explaining that conduct was unreasonable where government position and subsequent response to FOIA request were contrary to statute and case law). The argument that the Corps' failure stems from the law's lack of clarity also fails. Courts were already enforcing this "more specific foreseeable-harm analysis" by the time the Corps provided their updated *Vaughn* indices.

---

[6] A *Vaughn* index is an itemized list that "correlate[s] statements made in the Government's refusal justification with the actual portions of the document[s]" being exempted. *Vaughn v. Rosen*, 484 F.2d 820, 827 (D.C. Cir. 1973), *cert. denied*, 415 U.S. 977 (1974). In other words, it provides a detailed explanation of why the government seeks to exempt each relevant document.

*Rosenberg v. U.S. Dep't of Def.*, 342 F. Supp. 3d 62, 78 (D.D.C. 2018). The Corps' failure to comply with the Act was unreasonable. *See Leopold v. U.S. Dep't of Just.*, No. 21-cv-942, 2023 WL 1875229, at *7 (D.D.C. Jan. 26, 2023), *report and recommendation adopted*, 2023 WL 1875209 (D.D.C. Feb. 10, 2023) (explaining reasonableness analysis may include government satisfaction of foreseeable harm requirement).

b.    Incorrect basis for venue transfer

The transfer of this litigation from the Northern District of California provides an additional basis to find the Corps' actions unreasonable. FOIA permits filing a complaint in "the district . . . in which the agency records are situated." 5 U.S.C. § 552(a)(4)(B). FOR filed in the Northern District of California based on its belief that many of the records it sought were likely there. *See* Compl. ¶ 4. The Corps successfully transferred venue to Washington, D.C., based in part on its representation "that the responsive documents are, in fact, *entirely* located" outside of the Northern District of California. Venue Op. at 4. However, the Corps eventually found many of the records at issue in the Northern District of California. *See* Pl.'s Mot. at 6. This error cuts against the Corps.

An agency's unreasonable search for records may support awarding attorney's fees; however, "[a]gencies should not be penalized or disincentivized from voluntarily and promptly revisiting the adequacy of their [search] efforts after litigation has commenced, at least where there is no evidence of bad faith or indifference." *Los Padres ForestWatch v. U.S. Forest Serv.*, 775 F. Supp. 3d 353, 368 (D.D.C. 2025). In *ForestWatch*, Judge Moss considered a party's failure to initially discover responsive documents. Judge Moss determined that there was no indifference where the agency internally "identified the [inadequate search] and took steps expeditiously to resolve it" without court involvement or harm to the requestor. *Id.* Contrast *ForestWatch* with here: the Corps definitively stated that no records were in the district, leveraged this position to

10

successfully transfer venue across the country, and only after conducting further searches conceded that it based its original position on "an erroneous 'expectation' of where records were expected to be found." Opp'n at 14–15. Had the Corps proffered a less certain—and more accurate—expectation in its initial opposition, the court likely would not have transferred venue. This is because under Rule 12(b)(3), a court at the venue transfer stage "is obligated to draw all reasonable inferences in favor of the non-moving party and resolve all factual conflicts in favor of the non-moving party." *Murphy v. Schneider Nat'l, Inc.*, 362 F.3d 1133, 1138 (9th Cir. 2004). The Corps' flip-flop on location of the records demonstrates at least indifference.

Based on the Corps' failure to demonstrate foreseeable harm and the improper basis for venue transfer, the Corps did not carry its burden that it acted reasonably. *See Davy*, 550 F.3d at 1162–63.

### 3.    *Balancing the Four Factors*

FOR is eligible for fees. And all four entitlement factors favor FOR. Thus, FOR is entitled to fees.[7] "Where, as here, the government has frustrated the policy of open government embodied

---

[7] If the Corps' conduct was reasonable, the Court would then use its "broad discretion" to balance the three factors in favor of awarding fees versus the one against. *Morley*, 894 F.3d at 391. On one occasion, the D.C. Circuit upheld a denial of fees where the first three factors supported the movant but the fourth supported the government. *See id.* at 396. However, in that case, "factors one through three favored [Plaintiff] . . . only slightly[,]" and "the fourth factor heavily favored [Defendant]." *Id.* The fourth factor "heavily favored" Defendant because, among other things, (1) "the exact same records were publicly available at the [National] Archives" and reasonably suggested that the CIA was not required to disclose them themselves, (2) the records included "foreign intelligence or counterintelligence activities" that typically are "exempt from FOIA requests[,]" (3) the CIA reasonably thought that mere confirmation or denial of files' existence posed national security risks, and (4) the CIA correctly withdrew some of its exemptions following a change in controlling law. *Id.* at 393–96. That is very different than the present case. Here, the first three factors strongly favor FOR. And none of the Corps' actions rely on bases analogous to, or as reasonable as, those listed for *Morley*. Thus, "[e]ven if the fourth factor did not weigh in [FOR's] favor, the Court would still find that the other three factors are sufficient to entitle [FOR] to fees." *Mattachine Soc'y of D.C. v. U.S. Dep't of Just.*, 406 F. Supp. 3d 64, 70 (D.D.C. 2019).

in the Act and necessitated years of costly litigation, plaintiff[] need[s] and deserve[s] adequate incentive to pursue their cause in court." *Williams v. FBI*, 17 F. Supp. 2d 6, 9 (D.D.C. 1997).

      B.    <u>Attorney's Fee Calculation</u>

         1.    *Rate*

            a.    Determining the local rate

As FOR concedes, "the relevant market for purposes of determining the prevailing rate to be paid in an attorney fee award is the community in which the district court sits." Pl.'s Mot. at 18 (citing *Salazar v. District of Columbia*, 30 F. Supp. 3d 47, 62 (D.D.C. 2014)). However, FOR argues that a "special circumstance" justifies awarding San Francisco rates. *Polk v. N.Y. State Dep't of Corr. Servs.*, 722 F.2d 23, 25 (2d Cir. 1983); *see* Pl.'s Mot. at 18. FOR seeks to create an exception where an attorney files suit in their home district and the case is later transferred. *See* Pl.'s Mot. at 18. FOR further argues for this exception because the venue transfer here was based on the Corps' incorrect assertion. *See id.* at 19–20.

"Our Court of Appeals has identified two exceptions to th[e] rule" that lawyers are paid "based on the rates paid in the community where the district court is located." *Salazar*, 30 F. Supp. 3d at 62. "First, the attorney's local rate should apply 'when an out-of-town attorney is used because of special expertise or the unwillingness of local counsel to take the case.'" *Id.* (quoting *Davis Cnty. Solid Waste Mgmt. & Energy Recovery Special Serv. Dist. v. EPA*, 169 F.3d 755, 758 (D.C. Cir. 1999)). "Second, the attorney's local rate should apply 'where out-of-jurisdiction lawyers would receive substantially higher rates than they ordinarily command for work done almost exclusively in their home territory.'" *Id.* (quoting *Davis*, 169 F.3d at 758). FOR does not argue that its claim falls into either of these established exceptions. And, using its "broad

discretion" in fees cases, the Court declines to create a third exception. *Morley*, 894 F.3d at 391. Therefore, Washington, D.C. rates apply.

The parties dispute which fee matrix applies.[8] FOR argues for LSI *Laffey* Matrix application (if Washington, D.C., rates apply). *See* Pl.'s Mot. at 23–24. The Corps instead asks for the Fitzpatrick Matrix. *See* Opp'n at 15.

The LSI *Laffey* Matrix was "[t]he most commonly used fee matrix" in Washington, D.C., for many years. *Eley*, 793 F.3d at 100. However, "as time passe[d], the *Laffey* Matrix[,] . . . like shoulder pads, eight-tracks, and other '80s fads before it[,] . . . los[t] its shine." *DL v. District of Columbia*, 924 F.3d 585, 594 (D.C. Cir. 2019). Specific issues with the LSI *Laffey* Matrix include

---

[8] A matrix for calculating attorney's fees is a table of attorney hourly rates based on their years of experience as a lawyer and is used to estimate the fee that a public interest attorney's work would command if they worked for profit.

The "*Laffey* Matrix" is based on hourly rates for D.C. lawyers based on their complex litigation experience. *See Laffey v. Nw. Airlines, Inc.,* 572 F. Supp. 354, 371 (D.D.C. 1983), *aff'd in part, rev'd in part on other grounds*, 746 F.2d 4 (D.C. Cir. 1984), *overruled in part on other grounds by*, *Save Our Cumberland Mtns., Inc. v. Hodel*, 857 F.2d 1516 (D.C. Cir. 1988). Specifically, the *Laffey* Court created this matrix from a compilation of twenty-five affidavits by local attorneys in the early 1980s. *See id.* at 371–72.

Courts and lawyers have sought to update the *Laffey* matrix to more accurately reflect present-day rates of D.C. attorneys. One revised matrix is the LSI *Laffey* Matrix, which "uses the Legal Services Index of the Bureau of Labor Statistics to adjust for inflation." *Eley v. District of Columbia*, 793 F.3d 97, 101 (D.C. Cir. 2015). This matrix was "[d]eveloped by Michael Kavanaugh, an economist from Hawaii," and "tracks the national rate of change in the cost of legal services." *Id.* at 101–02 (emphasis omitted).

The D.C. U.S. Attorney's Office created the "Fitzpatrick Matrix" in 2021 as a competitor to the LSI *Laffey* Matrix. *See J.T. v. District of Columbia*, 652 F. Supp. 3d 11, 26 (D.D.C. 2023). "The [Attorney's Office] retained law professor Brian Fitzpatrick to create that matrix, which is based on the hourly rates charged by lawyers litigating in the United States District Court for the District of Columbia, as recorded in motions for attorneys' fees brought between May 31, 2013[,] and May 31, 2020." *Id.* It uses 675 data points from these motions for its schedule and adjusts for inflation in the same manner as the LSI *Laffey* Matrix. *See id.*

"(1) the age of the raw data; (2) whether it captures a truly representative sample of complex federal litigators; and (3) the grouping of attorneys into just five experience bands." *Id.*

For these reasons, courts have pivoted. Many have found "that the Fitzpatrick Matrix rates are more in line with the prevailing market rate and thus more reasonable than the LSI *Laffey* Matrix." *J.T.*, 652 F. Supp. 3d at 28; *see also Alavi v. Bennett*, No. 15-cv-2146, 2024 WL 5056204, at *13 (D.D.C. Dec. 10, 2024) ("[M]embers of this Court have concluded—in comparing the LSI Laffey and Fitzpatrick matrices—that the Fitzpatrick Matrix is a superior reflection of reasonable rates."). Indeed, one court recently found that the "Fitzpatrick Matrix rates presumptively apply" in complex federal cases. *Louise Trauma Ctr. LLC v. U.S. Dep't of Homeland Sec.*, No. 20-cv-1128, 2023 WL 3478479, at *4 (D.D.C. May 16, 2023).

Undeterred, FOR provides rates data and declarations from area attorneys in line with the LSI *Laffey* Matrix to support its preferred rate. A party can support use of its requested rate if it provides evidence that the rate is "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984). However, FOR's argument fails because its evidence is too dated and/or not for similar services.

First, FOR cites to the rates paid "for work done in a matter before the U.S. Supreme Court." Pl.'s Mot. at 28. However, that is not a similar case to a FOIA dispute in district court. *Cf. Covington v. District of Columbia*, 57 F.3d 1101, 1109 (D.C. Cir. 1995). Second, FOR references "rates data and analysis available in legal periodicals." Pl.'s Mot. at 28–29; *see* Decl. Christopher Sproul Supp. Pl.'s Mot. Att'ys' Fees & Costs ¶¶ 63–64, ECF No. 108. But these datasets are dated, which makes them inapplicable. *See Covington*, 57 F.3d at 1109 (highlighting value of "recent fees" in comparable cases as source of comparison). They primarily come from the National Law

Journal in 2014 and the Thompson Reuters Billing Report in 2016.[9] *See* Pl.'s Mot at 28. This predates the Fitzpatrick Matrix data that "rests on fee data from 2013 through 2020." *J.T.*, 652 F. Supp. 3d at 33. Last, FOR attaches declarations from various attorneys in Washington, D.C., attesting to local attorney rates that are in line with FOR's rate. *See* Pl.'s Mot. at 28; ECF No. 108-20–29. However, these declarations are either nearly a decade old, do not address a FOIA dispute, or both. Thus, FOR's evidence fails to support using the LSI *Laffey* Matrix. *See Louise Trauma*, 2023 WL 3478479, at *5 (explaining that litigation on non-analogous cases "do[es] not persuade" a court to apply those rates).

### b.    Determining complexity

There is one final consideration before applying the Fitzpatrick Matrix: its rates only apply if the litigation is "complex." *Bond ex rel. K.M. v. Friendship Pub. Charter Sch. Bd. of Trs.*, No. 23-cv-367, 2023 WL 8710370, at *5 (D.D.C. Dec. 18, 2023) (internal citation omitted). "[T]here is no presumption that FOIA cases qualify as complex federal litigation." *Webster v. U.S. Dep't of Just.*, No. 02-cv-603, 2021 WL 4243414, at *11 (D.D.C. Sep. 17, 2021). A party "must show that this particular case qualifies as complex federal litigation." *Louise Trauma*, 2023 WL 3478479, at *4. If it is not complex, courts apply "a rate considerably below" the otherwise applicable rate due to the reduced complexity. *Rooths v. District of Columbia*, 802 F. Supp. 2d 56, 63 (D.D.C. 2011).

FOR primarily argues that FOIA litigation should categorically be considered complex. *See* Pl.'s Mot. at 24–26. But this is wrong as a matter of law. *See supra*, Part III.B.1.b. FOR's secondary argument is based on affidavits concluding that FOIA litigation is complex. *See* Decl. David K. Colapinto ¶ 16, ECF No. 108-20 ("Based on more than 25 years experience . . . I can

---

[9] FOR also draws on data from the American Lawyer in 2020. But that reporting was limited to bankruptcy work, which is too dissimilar for comparison. *See Louise Trauma*, 2023 WL 3478479, at *10.

attest that FOIA litigation is complex civil litigation."). This is marginally more helpful. An "attorney's own affidavits" can be part of "satisfactory evidence" that requested rates are proper. *Eley*, 793 F.3d at 100 (quoting *Blum*, 465 U.S. at 895 n.11).

Regardless, the Corps' litigation strategy ultimately puts this issue to bed. In its opposition, the Corps repeatedly describes the Fitzpatrick Matrix as the proper fee matrix. *See* Opp'n at 16–18. This litigation strategy "obviated" the complexity assessment. *J.T.*, 652 F. Supp. 3d at 29. "In its choice of [an] alternative fee matrix, . . . [D]efendant apparently concedes that the relevant market is that of complex federal litigation." *Id.* at 30.

In sum, Fitzpatrick Matrix rates apply.

2.    *Billing Deficiencies*

"[S]upporting documentation [of a fee request] must be of sufficient detail and probative value to enable the court to determine with a high degree of certainty that such hours were actually and reasonably expended." *Role Models*, 353 F.3d at 971 (internal citations and quotations omitted).

To begin with, FOR excluded some of its time as an exercise in "billing judgment." Pl.'s Mot at 11. These exclusions include work on: "pre-litigation negotiations with the Corps"; unsuccessful claims in its complaints; unsuccessful claims in the three summary judgment motions; and some of the post-final judgment work and fees settlement negotiations. *Id.* at 12–17. The Corps objects to other entries as well.

First, FOR originally sought fees on its unsuccessful claims. *See, e.g.*, Pl.'s Mot. at 16. Judge Cobb previously granted in part and denied in part FOR's summary judgment motion. *See generally* Mem. Op. Because "the 'results obtained'" were mixed, FOR is entitled to a reduced award. *Hensley*, 461 U.S. at 434. FOR initially made a $70,140 reduction to reflect this. *See* Pl.'s

16

Mot. at 11. Subsequently, FOR further reduced its request. *See* Reply at 19–20. FOR's method of reducing time billed for unsuccessful claims was to determine the percentage of the total number of pages assigned to unsuccessful arguments and cut that percentage of hours from respective filings. *See id.* at 20. Courts have previously accepted this method as a reasonable billing reduction practice. *See Michigan v. EPA*, 254 F.3d 1087, 1091 (D.C. Cir. 2001). The Corps provided no analysis of what else should be cut on unsuccessful claims. Thus, the Court declines to decrease the award further for this reason.

Second, the Corps argues that FOR's bills are vague, of uncertain relevance, and contain duplicative or unnecessary entries. *See* Opp'n at 3. To ensure records are not vague, duplicative, or unnecessary, courts require movants to produce "contemporaneous, complete and standardized time records [that] accurately reflect the work done by each attorney." *Citizens for Resp. & Ethics in Wash. v. FEC*, 66 F. Supp. 3d 134, 148 (D.D.C. 2014). Certain entries by FOR were too vague. For example, in one ten-day period, a FOR attorney billed over seventy hours using entries that only state: "Legal and fact research for, and drafting of Reply Brief in support of motion for summary judgment and opposition to motion to dismiss." Opp'n at 11. As seen in *Role Models*, such entries are legally deficient. 353 F.3d at 971. There, the movant billed 53.5 hours over an 8-day period with entries stating "[r]esearch and writing for appellate brief." *Id.* The D.C. Circuit found such entries "lack[ed] adequate detail." *Id.* These "shortcomings in [] time records are . . . serious" when a party bills so many hours in a case. *Id.* at 972. As was the case there, a decrease in billed hours is appropriate here. *See id.*

Other examples of inadequate billing entries include "[r]esearch[ing] local rules[,]" "[r]eview[ing] and revis[ing] time records[,]" and clerical and/or administrative tasks. Pl.'s Mot., Ex. 1, Time Records: Patricia Linn 40–41, ECF No. 106-3. These are not recoverable. "[E]very

attorney who practices in this Court must certify their familiarity with both local and federal rules." *Louise Trauma*, 2023 WL 3478479, at \*6. This weighs against approving related entries. *See id.* And billings to correct time records are typically "unnecessary." *Id.* (quoting *Elec. Priv. Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 982 F. Supp. 2d 56, 60 (D.D.C. 2013)). Nor can the attorneys recover for clerical or administrative tasks. *See Michigan*, 254 F.3d at 1095.

The total decrease in billed time must reflect FOR's above deficiencies. Moreover, the Court zooms out from line-by-line entries to review the litigation as a whole, including: the page count of relevant briefs, detail and thoroughness of relevant issues in briefs giving rise to the fee request, and years of litigation. *See Ctr. for Popular Democracy*, 2021 WL 4452202, at \*13–14. While no two cases are alike, comparison to other cases provides guidance. *See, e.g.*, *id.* Ultimately, "trial courts need not, and indeed should not, become green-eyeshade accountants. The essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection." *Fox v. Vice*, 563 U.S. 826, 838 (2011). Because of this, percentage reductions to fee requests are commonplace. *See, e.g.*, *Role Models*, 353 F.3d at 973 (reimbursing "only fifty percent of the attorney hours that [Plaintiff] requests").

The Court has the benefit of several recent FOIA cases from the D.C. District Court for fees reduction comparison. The below table compiles relevant data for each.

Table 1: Comparable FOIA Litigation

| Case | Year | Docket | P's Request (Using court-applied matrix) | Awarded | % Granted |
|---|---|---|---|---|---|
| *FOR v. Corps* | 2025 | 16-2327 | $614,417.90 | $491,676.60 | **80%** |
| *Louise Trauma v. DHS* | 2023 | 20-1128 | $201,844.00 | $106,098.00 | **53%** |
| *Naumes v. Army* | 2023 | 21-1670 | $136,126.55 | $111,415.33 | **82%** |
| *WP Co. v. DHS* | 2023 | 20-1487 | 91,290.60 | $55,000.00 | **60%** |

| | | | | | |
|---|---|---|---|---|---|
| *EPIC v. IRS* | 2023 | 18-902 | $59,679.72 | $57,005.71 | **96%** |
| *AO v. DOJ* | 2019 | 17-727 | $32,345.36 | $21,563.57 | **67%** |
| *CRT v. FDA*[10] | 2009 | 00-2849 | $471,926.00 | $246,000.00 | **52%** |

Fact-specific factors courts considered in the above cases provide insight as to where FOR should exist along this spectrum. In *Louise Trauma*, the court "reduce[d] the hours the [defendant] recover[ed]" where the plaintiffs had several entries that were "[v]ague" or "unnecessary." 2023 WL 3478479 at *6–7 (quoting *Elec. Priv. Info. Ctr.*, 982 F. Supp. 2d at 60). The court's reduction was so large because there were "significant inefficiencies and a lack of billing judgment[,]" as well as a "lack[ of] adequate detail" in *most* billing entries. 2023 WL 3478479, at *6–7. FOR's billing practices problems were not as widespread.

Alternatively, in *Elec. Priv. Info. Ctr.* (*EPIC*), the court awarded 96% of the plaintiff's request. *See* 2023 WL 4892712, at *19. There, the only deficiency was a minor failure by the plaintiff to decrease its requested fees in accordance with the level of success achieved via litigation. *See id.* at *18. FOR's failures were greater.

Both *WP Co. LLC* (*WP Co.*) *v. Dep't of Homeland Sec.*, No. 20-cv-1487, 2023 WL 1778196 (D.D.C. Feb. 6, 2023), and *Am. Oversight* (*AO*) *v. U.S. Dep't of Just.*, 375 F. Supp. 3d 50 (D.D.C. 2019) provide additional support for a decrease less than *Louise Trauma* but more than *Elec. Priv. Info. Ctr.* In *WP Co.*, the "case was quite simple and involved little substantive briefing." 2023 WL 1778196, at *6. Yet, movant's fees request "include[d] time spent on fruitless motions and fixing the lawyers' own mistake." *Id.* A drastic cut like there is not needed here in

---

[10] In *Campaign for Responsible Transplantation* (*CRT*) *v. FDA*, the parties stipulated to the percentage of the requested amount awarded. CRT's resolution via settlement means that the fee award was not determined by a court. Still, the dollar amount is instructive as this Court considers the comparative size of the FOIA awards.

part because FOR already cut out its unsuccessful claims. *See* Pl.'s Mot. at 11; Reply at 19–20. The large cut in *AO* was appropriate because the movant "systematically billed excessive numbers of hours for simple tasks attendant to all FOIA litigation—involving little to no complex litigation strategy, substantive expertise, or legal research and argument—and routinely overstaffed these straightforward tasks with multiple attorneys." 375 F. Supp. 3d at 70 (quoting Defs.' Opp'n Pl.'s Fee Pet. ("Defs.' Opp'n") 38, *AO v. U.S. Dep't of Just.*, No. 1:17-cv-727 (D.D.C. July 13, 2018), ECF No. 24). Again, FOR's billing deficiencies, though apparent, do not rise to these levels.

*CRT v. FDA* had the largest award the Court has found. *See generally* Stip. of Settlement & Dismissal ("Settlement"), *CRT v. FDA*, No. 1:00-cv-2849 (D.D.C. Feb. 26, 2009), ECF No. 153. The litigation there lasted about nine years—which is about the same as here—and with nearly as many dispositive motions and filings throughout the course of that litigation. *See generally CRT v. FDA*, No. 00-cv-2849. The final award there, in what appears to be among the most complicated FOIA cases in recent district history, is almost exactly half of what the Court is awarding here. *See* Settlement at 1.

*Naumes v. Dep't of the Army* is the Goldilocks case. No. 21-cv-1670, 2023 WL 4350786 (D.D.C. July 5, 2023). The failure in *Naumes*—billing for unsuccessful claims—was larger than in *EPIC*. *See id.* at *6. While the court approved of the majority of Naumes's claims, Naumes still requested fees for the entirety of an unsuccessful summary judgment motion. *See id.* at *3. After removing the time billed for this motion and applying a 5% deduction to the remaining time, the court awarded 82% of the total award. *See id.* at *7. Considering billing deficiencies and awards in other cases, a similar decrease as in *Naumes* is warranted here. Thus, the Court will apply a 20% decrease in hours expended by FOR.

3.    *Litigating the Attorney's Fee Award*

"While it is settled in this circuit that [h]ours reasonably devoted to a request for fees are compensable, fees on fees must be reasonable, and not excessive." *Elec. Priv. Info. Ctr. v. FBI*, 80 F. Supp. 3d 149, 162 (D.D.C. 2015) (internal quotations and citations omitted). "Courts, therefore, have an obligation to scrutinize the hours spent preparing the fee petitions to insure that the total is reasonable and that it does not represent a windfall for the attorneys." *Id.* (internal quotations omitted).

The Corps does not detail whether any billing entries in the fees motion were unreasonable, and in this absence the Court will follow the lead of other courts in this district and "award [FOR] the same percentage of fees for fee litigation as it does for fees on the merits." *Elec. Priv. Info. Ctr.*, 982 F. Supp. 2d at 61. Therefore, the Court will also reduce this portion of the award by 20%.

C.    <u>Totals</u>

1.    *Attorney's Fees Charts*

Adding together the below tables, FOR is entitled to $491,676.60 in fees.

Table 2: Fees for Patricia Linn[11]

| Time Period | Billed Hours | Court's Adjusted Hours | Fitzpatrick Matrix Rate | Fees Earned |
|---|---|---|---|---|
| 2016 | 75.38 | 60.30 | $442 | $26,654.37 |
| 2017 | 224.66 | 179.73 | $483 | $86,808.62 |
| 2018 | 69.11 | 55.29 | $522 | $28,860.34 |
| 2019 | 96.44 | 77.15 | $562 | $43,359.42 |
| 2020 | 169.58 | 135.66 | $601 | $81,534.06 |

---

[11] Both the "Court's Adjusted Fees" and the "Fees Earned" columns in each table are rounded to two decimal places. The total fee for each attorney is calculated using the unrounded figures before itself being rounded to the nearest cent.

| | | | | |
|---|---|---|---|---|
| 2021 | 17.50 | 14.00 | $615 | $8,610.00 |
| 2022 | 6.00 | 4.80 | $647 | $3,105.60 |
| 2023 | 146.40 | 117.12 | $697 | $81,632.64 |
| 2024 | 25.90 | 20.72 | $757 | $15,685.04 |
| Total | 830.97 | 664.46 | ----- | $376,250.10 |

Table 3: Fees for Christopher Sproul

| Time Period | Billed Hours | Court's Adjusted Hours | Fitzpatrick Matrix Rate | Fees Earned |
|---|---|---|---|---|
| 2016 | 13.51 | 10.81 | $608 | $6,571.26 |
| 2017 | 47.31 | 37.85 | $639 | $24,184.87 |
| 2018 | 8.50 | 6.80 | $670 | $4,556.00 |
| 2019 | 4.63 | 3.70 | $700 | $2,592.80 |
| 2020 | 3.00 | 2.40 | $729 | $1,749.60 |
| 2021 | 0.23 | 0.18 | $736 | $135.42 |
| 2022 | 1.50 | 1.20 | $760 | $912.00 |
| 2023 | 30.99 | 24.79 | $807 | $20,007.14 |
| 2024 | 16.22 | 12.98 | $864 | $11,211.26 |
| Total | 125.89 | 100.71 | ----- | $71,920.37 |

Table 4: Fees for Brian Wilcox

| Time Period | Billed Hours | Court's Adjusted Hours | Fitzpatrick Matrix Rate | Fees Earned |
|---|---|---|---|---|
| 2016 | 0 | 0 | $374 | $0 |
| 2017 | 0 | 0 | $416 | $0 |
| 2018 | 0 | 0 | $458 | $0 |

| | | | |
|---|---|---|---|
| 2019 | 3.56 | 2.85 | $500 | $1,424.00 |
| 2020 | 0 | 0 | $541 | $0 |
| 2021 | 0 | 0 | $558 | $0 |
| 2022 | 5.00 | 4.00 | $589 | $2,356.00 |
| 2023 | 49.20 | 39.36 | $638 | $25,111.68 |
| 2024 | 22.50 | 18.00 | $698 | $12,564.00 |
| Total | 80.26 | 64.21 | ----- | $41,455.68 |

Table 5: Paralegal Fees

| Time Period | Billed Hours | Court's Adjusted Hours | Fitzpatrick Matrix Rate | Fees Earned |
|---|---|---|---|---|
| 2016 | 6.32 | 5.06 | $160 | $808.96 |
| 2017 | 0.23 | 0.18 | $169 | $31.10 |
| 2018 | 0 | 0 | $179 | $0 |
| 2019 | 0 | 0 | $189 | $0 |
| 2020 | 0 | 0 | $199 | $0 |
| 2021 | 0 | 0 | $200 | $0 |
| 2022 | 0 | 0 | $207 | $0 |
| 2023 | 6.77 | 5.42 | $220 | $1,191.52 |
| 2024 | 0.10 | 0.08 | $236 | $18.88 |
| Total | 13.42 | 10.74 | ----- | $2,050.46 |

2. *Costs*

"[T]he Court will grant the [Corps'] request for costs of [$2,548.74], which the agency does not specifically oppose." *Louise Trauma*, 2023 WL 3478479, at *8; *see generally* Case Costs Summ., ECF No. 117-10.

## IV. CONCLUSION

A 20% reduction is neither too hot nor too cold: it is just right.


**SO ORDERED.**


Date: August 8, 2025                    _____
                                        ZIA M. FARUQUI
                                        UNITED STATES MAGISTRATE JUDGE